**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.

APPROXIMATELY $793,369.68 IN U.S. CURRENCY SEIZED FROM ACCOUNT NO. 000000772419597 AT JP MORGAN CHASE BANK, N.A. IN THE NAME OF MIAMI SPECIAL CARE, INC.;

APPROXIMATELY $878,958.17 IN U.S. CURRENCY SEIZED FROM ACCOUNT NO. 000000668636635 AT JP MORGAN CHASE BANK, N.A. IN THE NAME OF ALVAR HOLDINGS CORP.; AND

APPROXIMATELY $912,915.20 IN U.S. CURRENCY SEIZED FROM ACCOUNT NO. 000000668623997 AT JP MORGAN CHASE BANK, N.A. IN THE NAME OF RARR MANAGEMENT CORP.

      **Defendants *In Rem*.**

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, by and through its undersigned counsel, alleges upon information and belief, as follows:

**I.      NATURE OF THE ACTION**

1.      This is a civil forfeiture action *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(C), the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the Federal Rules of Civil Procedure, to forfeit seized funds, more

fully described as the following (collectively, the "Defendant Assets"):[1]

     (i)     Approximately $793,369.68 in U.S. currency seized from account number 000000772419597 held at JP Morgan Chase Bank, N.A. in the name of Miami Special Care, Inc.;

     (ii)    Approximately $878,958.14 in U.S. currency seized from account number 000000668636635 held at JP Morgan Chase Bank, N.A. in the name of Alvar Holdings Corp.; and

     (iii)   Approximately $912,915.20 in U.S. currency seized from account number 000000668623997 held at JP Morgan Chase Bank, N.A. in the name of Rarr Management Corp.

## II.     JURISDICTION AND VENUE

2.     This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1).

3.     This Court has *in rem* jurisdiction over the Defendant Assets. *See* 28 U.S.C. §§ 1345, 1355(b).

4.     Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District where the Defendant Assets were brought upon seizure. *See* 28 U.S.C. §§ 1355(b)(1), 1395.

## III.    FACTUAL ALLEGATIONS

At all times material to this Action:

### A.     **The Medicare Program**

5.     The Medicare Program ("Medicare") was a federal health care program that provided free or below-cost health care benefits to individuals who are 65 years of age or older or disabled.

6.     The United States Department of Health and Human Services, through its agency, the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

---

[1] All dates and amounts referenced in this Verified Complaint are approximate.

7. Individuals who received benefits under Medicare were commonly referred to as "Medicare beneficiaries."

8. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b).

9. Medicare was subdivided into four parts: hospital insurance (Part A); medical insurance (Part B); Medicare Advantage (Part C); and prescription drug benefits (Part D).

10. Medicare Part B covered, among other things, skin substitutes, skin grafts, and surgical dressings. According to the CMS website, CMS.gov, Simplimax and Woundplus fall under "Skin Substitutes."

11. Medicare claims for Part B items and services were processed and paid by Medicare Administrative Contractors ("MAC[s]"), which contracted with CMS to administer parts of Medicare in specific jurisdictions.

12. First Coast Service Options, Inc. was the MAC that covered Florida.

13. Providers, among others, may have applied to become a "provider" with Medicare by submitting an application in which the provider agreed to abide by Medicare's policies, procedures, rules, and regulations governing reimbursement. If Medicare approved a provider's application, Medicare assigned the enrolled provider a Medicare "provider number."

14. Providers with a Medicare provider number could file claims with Medicare to obtain reimbursement for services provided on behalf of Medicare beneficiaries.

15. Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

16. To receive payment for a covered service from Medicare, providers had to submit a claim, either electronically or using a form, to the MAC. The claim had to contain the required information, including the provider's identifying information such as a Medicare-assigned

Provider Transaction Access Number, the patient's information, the services rendered, the name of the provider who rendered or provided the billed-for item or service, the name of the beneficiary, a medical diagnosis, the date the billed-for service was rendered or the items was provided, and the type of service rendered and/or item provided.

17.     Providers could only submit reimbursement claims to Medicare for items provided and/or services rendered that were reasonable and medically necessary.

18.     Reimbursement payments under Mediare were often made directly to a provider for the goods or services, rather than to a Medicare beneficiary.

19.     Medicare sent reimbursement payments directly to a provider's financial institution whether claims were filed electronically or on paper. Medicare required all providers to submit an electronic funds transfer agreement and a voided check or letter from their financial institution with their enrollment application to receive payments electronically.

**B.      Health Care Fraud Scheme Involving Miami Special Care Inc.**

20.     Miami Special Care, Inc. ("Miami Special") was an enrolled Medicare provider that purportedly provided skin graft substitutes to Medicare beneficiaries.

21.     Miami Special was a Florida corporation located in Miami, Florida, which is within the Southern District of Florida.

22.     Miami Special previously operated under the corporate name American Community Mental Health Center, Inc. ("American Community"), which was originally incorporated on or about July 6, 2018.

23.     According to American Community's Articles of Incorporation filed with the Florida Department of State, Individual 1 was American Community's initial president and registered agent.

24.     On or about July 11, 2018, American Community opened a JP Morgan Chase

account ending in 1213 with Individual 1 as a co-signatory with another individual, Individual 2. As explained below, JP Morgan Chase converted this account into JP Morgan Chase account number 000000772419597.

25. According to Medicare records, American Community became an eligible Medicare provider on or about January 3, 2020.

26. On or about September 28, 2021, American Community amended its Articles of Incorporation to change its name to Miami Special and replaced Individual 1 with Individual 3 as president and registered agent.

27. According to bank records, on or about February 28, 2022, Individual 3 amended the signature card on the account ending in 1213, changing the account holder name from American Community to Miami Special and listing Individual 3 as the account's sole signatory.

### i. Individual 4's Takeover of Miami Special Care

28. On or about August 29, 2024, Miami Special amended its Articles of Incorporation to replace Individual 3 with Individual 4 as president and registered agent.

29. Days later, on or about September 5, 2024, Medicare records show that Miami Special's enrollment application was amended, adding Individual 4 as the owner and authorized official of Miami Special.

30. According to bank records, on or about September 6, 2024, Individual 4 filed a new signature card for account ending in 1213, removing Individual 3 from the account and making Individual 4 the sole signatory.

31. JP Morgan Chase later conducted a balance transfer of Miami Special's account ending in 1213 to Miami Special's account ending in 000000772419597 ("account ending in 9597").

32. Beginning in or around January 2025, the bank statements for Miami Special's

account ending in 9597 reflected a change to the address line for Miami Special and reflected Miami Special's purported office address in Miami, Florida as of August 29, 2024.

33. A review of Medicare claims data for Miami Special shows that between in or around December 2024 through April 2025, after Individual 4's takeover, Miami Special submitted reimbursement claims to Medicare totaling approximately $13,444,822.46 for Simplimax and Woundplus skin substitute grafts purportedly provided to approximately nineteen (19) Medicare beneficiaries, but were medically unnecessary, not provided as represented, and not prescribed by a licensed medical professional.

34. All of the reimbursement claims submitted to Medicare by Miami Special during that period identified a single medical provider ("Physician 1") as the treating and/or prescribing provider for each claim.

35. Law enforcement interviewed one of the nineteen Medicare beneficiaries. That beneficiary told law enforcement that he or she was not familiar with Miami Special, did not receive or need the skin grafts that were billed to Medicare under his or her Medicare beneficiary information, and was not familiar with Physician 1.

36. Additionally, law enforcement interviewed Physician 1. Physician 1 stated that he or she had never heard of Miami Special, had never been employed by the company, and had never administered a skin graft in his or her nearly forty years of medical practice. Physician 1 further stated that he or she had never billed Medicare for performing any skin-graft procedure and had no knowledge of the products Simplimax or Woundplus.

37. Accordingly, 100% of Miami Special's reimbursement claims submissions were fraudulent.

38. Based on Miami Special's fraudulent claims submissions, Medicare approved a

portion of those claims, ultimately depositing Miami Special approximately $6,712,928.60 into Miami Special's account number ending in 9597.

### C.     Defendant Assets

#### i.     *Miami Special's Account Ending in 9597*

39.     Bank records for Miami Special's account ending in 9597 confirm Medicare's deposits, showing that between on or about February 21, 2025, and on or about April 30, 2025, Medicare deposited a total of approximately $6,712,928.60 in fraudulently obtained Medicare proceeds into the account.

40.     Bank records show that prior to the first Medicare deposit on or about February 21, 2025, Miami Special's account ending in 9597 had a balance of approximately $2,700.90.

41.     During the relevant period, bank records show that, with the except of a few nominal deposits, Miami Special's account ending in 9597 was funded almost entirely with those health care fraud proceeds.

42.     Bank records for Miami Special's account ending in 9597 further shows that a substantial portion of the Medicare fraud proceeds were typically transferred out to other accounts shortly after being deposited by Medicare.

43.     For example, bank records show that between in or around February 2025 and April 2025, Miami Special's account ending in 9597 transferred a total of approximately $2,943,376.09 in healthcare fraud proceeds to JP Morgan Chase account number 000000668636635. As explained in more detail below, this account was opened by Individual 4 and held in the name of Alvar Holdings Corp., a company owned by Individual 4.

44.     Similarly, bank records also show that during the same time period, Miami Special's account ending in 9597 transferred approximately $2,967,487.08 in healthcare fraud proceeds to JPMC account number 000000668623997. As explained in more detail below, this

account was also opened by Individual 4 and held in the name of Rarr Management, Corp., another company owned by Individual 4.

45.     As a result of transfers and/or other withdrawals, Miami Special's account ending in 9597 account balance was drawn down, leaving it with a balance of approximately $793,369.68.

46.     On or about May 7, 2025, JP Morgan Chase froze the account with that balance.

47.     That entire balance consisted of proceeds of Miami Special's health care fraud scheme.

48.     Between on or about May 7, 2025, and December 19, 2025, when law enforcement seized the $793,369.68 pursuant to a federal seizure warrant, no further deposits were made into the account.

### ii.     Alvar's Account Ending in 6635

49.     According to bank records obtained for JP Morgan Chase account number 000000668636635 ("account ending in 6635"), the account was opened on or about September 18, 2024, in the name of Alvar Holdings Corp. with Individual 4 as the sole signer on the account.

50.     According to documents obtained from the State of Florida, Individual 4 incorporated Alvar Holdings Corp. ("Alvar") in or around September of 2024, and was listed as the company's president and registered agent.

51.     Alvar's Articles of Incorporation list its purported principal place of business as the same address as Miami Special's purported place of business, both of which are within the Southern District of Florida.

52.     A review of banking records for Alvar's account ending in 6635, confirms numerous deposits between February 24, 2025, and April 25, 2025, from Miami Special's account ending in 9597, totaling approximately $2,943,376.09—all of which constitute, or are traceable to

health care fraud proceeds.

53. According to bank records, the account balance prior to the first deposit from Miami Special's account ending in 9597 was approximately $319.62.

54. During the relevant period, bank records show that Alvar's account ending in 6635 was funded entirely with health care fraud proceeds traceable to Miami Special's health care fraud scheme.

55. Bank records further show that a substantial portion of the approximately $2,943,376.09 in Medicare fraud proceeds received from Miami Special's account ending in 9597 were typically spent or withdrawn from the account shortly after being deposited into the account, which left an account balance of approximately $878,958.14.

56. On or about May 7, 2025, JP Morgan Chase froze the account with that balance.

57. That entire balance consisted of proceeds of Miami Special's health care fraud scheme.

58. Between on or about May 7, 2025, and December 19, 2025, when law enforcement seized the $878,958.14 pursuant to a federal seizure warrant, no further deposits were made into the account.

### iii. Rarr's Account Ending in 3997

59. According to bank records obtained for JP Morgan Chase account number 000000668623997 ("account ending in 3997"), the account was opened on or about September 18, 2024, the same day that Alvar's account ending in 6635 was opened.

60. Bank records show that the account was held in the name of Rarr Management, Corp., with Individual 4 as the sole signer on the account.

61. According to documents obtained from the State of Florida, Individual 4

incorporated Rarr Management, Corp. ("Rarr") in or around September of 2024, and was listed as the company's president and registered agent.

62. Rarr's Articles of Incorporation list its purported principal place of business as the same address as Miami Special's and Alvar's purported place of business.

63. A review of banking records for Rarr's account ending in 3997, confirms numerous deposits between February 24, 2025, and April 25, 2025, from Miami Special's account ending in 9597, totaling approximately $2,967,487.08—all of which constitute, or are traceable to health care fraud proceeds.

64. According to bank records, the account balance prior to the first deposit from Miami Special's account ending in 9597 was approximately $364.62.

65. During the relevant period, bank records show that, with the except of a few nominal deposits, Rarr's account ending in 3997 was funded almost entirely with health care fraud proceeds traceable to Miami Special's health care fraud scheme.

66. Bank records further show that a substantial portion of the approximately $2,967,487.08 in Medicare fraud proceeds received from Miami Special's account ending in 9597 were typically spent and/or withdrawn from the account shortly after being deposited into the account, which left an account balance of approximately $912,915.20.

67. On or about May 7, 2025, JP Morgan Chase froze the account with that balance.

68. That entire balance consisted of proceeds of Miami Special's health care fraud scheme.

69. Between on or about May 7, 2025, and December 19, 2025, when law enforcement seized the $912,915.20 pursuant to a federal seizure warrant, no further deposits were made into the account.

#### iv.     Seizure Warrant

70.     On or about December 19, 2025, law enforcement agents served a federal seizure warrant on JP Morgan Chase for all funds on deposit in the following accounts: Miami Special's account ending in 9597, Alvar's account ending in 6635, and Rarr's account ending in 3997. *See* Case No. 25-MJ-04448-Louis (S.D. Fla.).

71.     Pursuant to that seizure warrant, JP Morgan Chase remitted a total of $2,585,243.02 in U.S. currency, compromised of $793,369.68 from Miami Special's account ending in 9597, $878,958.14 from Alvar's account ending in 6635, and $912,915.20 from Rarr's account ending in 3997—the Defendant Assets.

## IV.     <u>BASIS FOR FORFEITURE</u>

72.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity is subject to civil forfeiture.

73.     Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

74.     Health care fraud, in violation of 18 U.S.C. § 1347, is a "Federal health care offense." *See* 18 U.S.C. § 24.

### <u>FIRST CLAIM</u>
**Proceeds of Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

75.     The factual allegations in paragraphs 1 through 74 are re-alleged and incorporated by reference as if fully set forth herein.

76.     As set forth above, the Defendant Assets are property that constitutes or are derived from proceeds traceable to health care fraud in violation of 18 U.S.C. § 1347, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

77.     Accordingly, the Defendant Assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**WHEREFORE**, Plaintiff, the United States of America, requests that the Clerk of the Court issue a warrant for the arrest *in rem* of the Defendant Assets; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Assets; that the Defendant Assets be forfeited and condemned to the United States of America; and for such other and further relief as may be deemed just, necessary and proper.

Respectfully submitted,

**JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY**

By:     /s/ Brian H. Zack
       Brian H. Zack
       Assistant United States Attorney
       Florida Bar No. 1000416
       United States Attorney's Office
       for the Southern District of Florida
       99 NE 4th Street, Suite 700
       Miami, Florida 33132
       Telephone: (305)-961-9407
       Email: Brian.Zack@usdoj.gov

**<u>VERIFICATION</u>**

I, Garrett Young Bowman, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement agents, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

Executed on this 22 of ___JUNE___ 2026

Garrett Young Bowman
Special Agent, Federal Bureau of Investigation

13